Filed 5/16/13  P. v. Garcia CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>VICTOR ROBERT GARCIA,<br><br>　　Defendant and Appellant. | G045724<br><br>(Super. Ct. No. 10NF3235)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, M. Marc Kelly, Judge.  Affirmed.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, James D. Dutton and Sabrina Y. Lane-Erwin, Deputy Attorneys General, for Plaintiff and Respondent.

*　　　　*　　　　*

INTRODUCTION

Defendant Victor Robert Garcia appeals from the judgment entered after a jury found him guilty of two counts of carjacking and one count of being a felon in possession of a firearm. The jury found Garcia personally used a firearm in the commission of one of the carjacking offenses, and personally used a knife in the other. The trial court found Garcia had suffered two prior serious felony convictions and five prior serious and violent felony convictions. The court also found he had served two prior prison terms.

Garcia argues the trial court erred by (1) summarily denying his motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*), in which he sought the discovery of the personnel file of a police officer who was involved in the investigation of one of the carjacking offenses (the *Pitchess* motion); (2) denying Garcia's motion to sever the carjacking count involving the firearm and the firearm possession count from the carjacking count involving the knife (the motion to sever); (3) violating his right to confront witnesses, by admitting evidence of one carjacking victim's 911 call to police because the victim was unavailable to testify at trial; and (4) denying his motion to strike his prior convictions for purposes of sentencing, pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

We affirm. Garcia failed to show good cause supported the *Pitchess* motion. The trial court did not abuse its discretion in denying the motion to sever pursuant to the analytical framework of *People v. Cook* (2006) 39 Cal.4th 566, 581. The trial court did not err by admitting evidence of the 911 call. The record shows the court was aware of its discretion and authority to strike the prior convictions, and it considered all the relevant circumstances before ruling on the motion to strike the prior convictions. In light of the length and nature of Garcia's criminal history, the court was well within its discretion to refuse to strike any prior convictions.

2

I.

GARCIA CARJACKS EDUARDO RONSIVALLE USING A HANDGUN.

At 4:25 a.m. on September 25, 2005, Eduardo Ronsivalle called 911 from a gas station in Anaheim, and told the dispatcher, Dawn Roberts, that he had been carjacked and that a Hispanic male took his Toyota Matrix vehicle. Ronsivalle told Roberts the carjacking had occurred 10 minutes earlier, and he had since been looking for a public telephone. He explained that the man was on a bicycle and "got in front of [Ronsivalle]" while Ronsivalle was in his vehicle. The man pointed a handgun at Ronsivalle and Ronsivalle did not move. The man took Ronsivalle's wallet, bank card, tools, and camera. Roberts asked if he needed the paramedics. Ronsivalle said he did not know and he had "a low heart rate."

Ronsivalle's vehicle was later recovered. Officer Ed DeLeon of the Anaheim Police Department returned the vehicle to Ronsivalle. A sample of DNA taken from the steering wheel of the vehicle contained a mixture of DNA from two or more individuals. Forensic scientist Jillian Zoccoli of the Orange County crime laboratory testified Garcia could not be eliminated as a major contributor to the DNA sample that was tested and the population frequency of the profile of the major contributor was one in one trillion. A sample of DNA was also taken from the right front interior door handle of the vehicle. According to Zoccoli, Garcia could not be eliminated as a contributor of that DNA; a population frequency calculation could not be performed on that sample because it had degraded.

II.

GARCIA CARJACKS RIGOBERTO DEGANTE USING A KNIFE.

About 1:45 a.m. on October 3, 2005, Rigoberto Degante left a restaurant in Anaheim and got into his Toyota Tacoma truck to drive home. A woman, whom Degante had never seen before, asked him to give her a ride; Degante agreed. He drove

only about a block before the woman asked him to park in an alley and to wait while she went to see a friend. Degante told the woman he was in a hurry and had to go home. The woman got out of the truck and left the passenger door open.

Degante then saw "a guy," whom he had never seen before (he later identified as Garcia), approach him on a bicycle. Garcia opened the driver's side door of the truck and told Degante, who was still in the driver's seat, to "get off the car." After Degante asked, "[w]hat for," Garcia "pulled a blade" and held it to Degante's throat while Degante was still sitting in the driver's seat. Degante got out of the truck.

Garcia told Degante to give him his wallet; Degante complied. Garcia also took Degante's shoes before getting into the driver's seat of the truck. The woman got into the passenger seat and Garcia drove away. (Garcia had put the bicycle that he had been riding in the truck.)

Degante went back to the restaurant where he called 911. He described the man who took his truck as Hispanic and stated that the man had tattoos on his wrists and a scar on his face.

Degante's truck was recovered and returned to Degante. A beer can found in the console of the front seat of the truck was submitted for DNA testing. DNA consistent with Garcia's DNA was found on the beer can; the population frequency of the DNA consistent with Garcia's DNA found on the beer can is one in 90 million.

On the Thursday afternoon before Degante testified at trial in 2011, he was in custody on an unrelated matter. He saw Garcia in the court building. Garcia told Degante, "[l]et's forget everything" and said he had "spent five years here." Garcia told Degante, "he had lost his family as well as [Degante] can lose [his] family." Degante saw Garcia again later that afternoon at which time Garcia reminded Degante, "[n]ot to forget what he had told [Degante]." Garcia told Degante that if Garcia lost his family, Degante would lose his, and warned him to keep his mouth shut.

4

A few days later, Degante heard Garcia instruct an unidentified person at the jail to "bring another person to tell [Degante] to keep [his] mouth shut." Someone approached Degante and asked him "not to rat"; then eight or nine people started beating up Degante, causing him injuries. Degante testified that Garcia's threats and the assault made Degante afraid to testify at trial.

### III.

### STIPULATIONS

Garcia and the prosecution stipulated to additional facts which were given to the jury. First, they stipulated that Garcia "has previously been convicted of a felony offense." Second, "Eduardo Ronsivalle is unavailable to testify in this trial because he fled to an unknown location in Argentina after an arrest warrant was issued for his failure to appear in court on a misdemeanor charge of Penal Code section 647[, subdivision ](a), solicitation or lewd conduct."

Third, Garcia and the prosecution stipulated to several facts regarding the forensic tests that had been conducted in this case, as follows: "One, on October 2nd, 2005 at approximately 1:40 p.m. C.S.I Officer Mark Sveinson of Anaheim Police Department properly took a D[NA] sample from the steering wheel and right front door latch of the Toyota Matrix . . . . [¶] He also lifted a latent fingerprint from the exterior right door above the handle. [¶] Two, on October 3rd, 2005 C.S.I. Officer Sveinson did an exterior door above the handle and a known sample of defendant Victor Garcia's fingerprints. He determined that the fingerprint from the exterior right door above the handle matched defendant Victor Garcia. [¶] Three, on October 4th, 2005 C.S.I. Officer Terri Powers-Raulston of Anaheim P.D. properly took a DNA sample from the Budweiser can found in the front console of the cab of the 2005 Toyota Tacoma . . . . [¶] Four, on January 4th, 2008 Orange County District Attorney's Officer Investigator Brian Penfold properly took a DNA sample from defendant Victor Garcia. [¶] Five, all of the

5

above DNA samples were properly booked into the Orange County crime lab and were used by Ms. Zoccoli in her DNA analysis."

PROCEDURAL BACKGROUND

Garcia was charged in an amended information with one count of carjacking in violation of Penal Code section 215, subdivision (a) against Ronsivalle (count 1); one count of carjacking in violation of section 215, subdivision (a) against Degante (count 2); and one count of possession of a firearm by a felon in violation of Penal Code section 12021, subdivision (a)(1) (count 3). (All further statutory references are to the Penal Code unless otherwise specified.)

The amended information alleged that, pursuant to section 12022.53, subdivision (b), Garcia personally used a firearm within the meaning of sections 1192.7 and 667.5, in the commission of count 1, and further alleged that, pursuant to section 12022, subdivision (b)(1), he personally used a deadly weapon (a knife) within the meaning of section 1192.7, in the commission of count 2. The information also alleged Garcia had served three prior prison terms within the meaning of section 667.5, subdivision (b); had two prior serious felony convictions within the meaning of section 667, subdivision (a)(1); and had five prior serious and violent felony convictions within the meaning of sections 667, subdivisions (d) and (e)(2)(A) and 1170.12, subdivisions (b) and (c)(2)(A).

The jury found Garcia guilty of all counts as charged and found true the weapon enhancement allegations alleged as to counts 1 and 2 respectively. The trial court found all of the prior conviction and prior prison term allegations true.

The trial court imposed a total prison term of 50 years to life, plus a consecutive 35-year determinate term as to counts 1 and 2 and the attendant enhancement allegations. The court stayed execution of sentence on count 3, under section 654. Garcia appealed.

6

DISCUSSION

I.

THE TRIAL COURT DID NOT ERR BY SUMMARILY
DENYING THE *PITCHESS* MOTION.

Garcia argues the trial court erred by summarily denying the *Pitchess* motion, in which he sought discovery of DeLeon's personnel records relating to his "lack of credibility," any "wrongful acts involving moral turpitude," and instances of "dishonesty/untruthfulness/veracity/false arrest/conduct unbecoming an officer/neglect of duty." (Some capitalization omitted.) The *Pitchess* motion was solely based on DeLeon's inconsistent testimony regarding one issue: At a hearing in January 2007, DeLeon testified he needed to use a Spanish language interpreter when he conducted a photo lineup for Ronsivalle, but at an October 2010 hearing, DeLeon testified that Ronsivalle spoke English during the photo lineup and that a Spanish language interpreter was not needed or used.

The trial court denied the *Pitchess* motion, stating: "The declaration makes it clear that the issues that are brought up by the moving party and declaration just has to do with a claim that the officer may not be telling the truth. The case law is pretty clear on that. This does not constitute a specific factual scenario of officer misconduct, which is attributable to the officer. So, therefore, the motion is denied." We review the trial court's denial of the *Pitchess* motion for abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

In *People v. Gaines* (2009) 46 Cal.4th 172, 179, the California Supreme Court reiterated the proper procedure for *Pitchess* motions: "[O]n a showing of good cause, a criminal defendant is entitled to discovery of relevant documents or information in the confidential personnel records of a peace officer accused of misconduct against the defendant. [Citation.] Good cause for discovery exists when the defendant shows both

7

"'materiality" to the subject matter of the pending litigation and a "reasonable belief" that the agency has the type of information sought.' [Citation.] A showing of good cause is measured by 'relatively relaxed standards' that serve to 'insure the production' for trial court review of 'all potentially relevant documents.' [Citation.] If the defendant establishes good cause, the court must review the requested records in camera to determine what information, if any, should be disclosed. [Citation.] Subject to certain statutory exceptions and limitations [citation], 'the trial court should then disclose to the defendant "such information [that] is relevant to the subject matter involved in the pending litigation."'"

In *Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1021-1022, the California Supreme Court explained, "a showing of good cause requires a defendant seeking *Pitchess* discovery to establish not only a logical link between the defense proposed and the pending charge, but also to articulate how the discovery being sought would support such a defense or how it would impeach the officer's version of events. *This court has long required that the information sought must be described with some specificity to ensure that the defendant's request is not so broad* as to garner "'all information which has been obtained by the People in their investigation of the crime'" *but is limited to instances of officer misconduct related to the misconduct asserted by the defendant*. (*Pitchess*, *supra*, 11 Cal.3d at p. 537; accord, *People v. Mooc* [(2001)] 26 Cal.4th [1216,] 1226; [*City of*] *Santa Cruz* [*v. Municipal Court* (1989)] 49 Cal.3d [74,] 85.) [¶] This specificity requirement excludes requests for officer information that are irrelevant to the pending charges. (See, e.g., *People v. Hustead* [(1999)] 74 Cal.App.4th [410,] 416 [prior complaints of excessive force by arresting officer 'irrelevant' after charge of resisting arrest was dropped and remaining charge was evasion of arrest in an automobile].) And it enables the trial court to identify what types of officer misconduct information, among those requested, will support the defense or defenses proposed to the pending charges. This inquiry establishes the statutorily required materiality prong of the

8

good cause showing that a defendant must make to receive in-chambers review of potentially relevant officer records." (Italics added.)

Garcia attempted to establish materiality and good cause of the requested discovery by arguing to the trial court, in the *Pitchess* motion, "[t]he in-court assertion on October 28, 2010 by De Leon that he 'did not have any difficulties' in communicating with [Ronsivalle] at the November 17th, 2005 photo lineup was [a]n apparent attempt to falsely bolster the level of certainty of the alleged identification by [Ronsivalle] of defendant from the photo line up."

But there has not been an issue in this case regarding Ronsivalle's certainty in identifying Garcia as the man who carjacked him. There is no evidence that the presence or absence of a Spanish language interpreter would have rendered any such identification less certain or reliable, or that there had been any breakdown in communication. Other than testifying that Ronsivalle spoke English during the photo lineup, DeLeon's testimony at trial was limited to confirming the uncontroversial facts including that he had been assigned to investigate that carjacking, that he had released the recovered Toyota Matrix vehicle to Ronsivalle, and that DeLeon had seen Garcia at a lineup that had been conducted in April 2006.

As Garcia has failed to show the materiality of the requested discovery and thus failed to show good cause, the trial court did not err by summarily denying the *Pitchess* motion.

## II.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING THE MOTION TO SEVER.

Garcia contends the trial court erroneously denied the motion to sever, in which Garcia sought a separate trial of counts 1 and 3 apart from count 2, under section 954. Section 954 provides: "An accusatory pleading may charge two or more

9

different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court; *provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately.* An acquittal of one or more counts shall not be deemed an acquittal of any other count." (Italics added.)[1]

"We review a trial court's decision not to sever for abuse of discretion based on the record when the motion is heard. [Citations.] A pretrial ruling denying severance that is not an abuse of discretion can be reversed on appeal only if joinder is so grossly unfair as to deny the defendant due process." (*People v. Cook*, *supra*, 39 Cal.4th at p. 581.)

In *People v. Cook*, *supra*, 39 Cal.4th at page 581, the Supreme Court stated: "Factors to be considered in assessing the propriety of joinder include: '(1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital

---

[1] In his opening brief, Garcia states he "recognizes that joinder of Counts 1 and 2 with Count 3 was proper under Penal Code section 954 because the offenses were all of the same class of crimes. However, even if joinder was proper under Penal Code section 954, it was an abuse of discretion to deny [Garcia]'s motion for severance of the cases, and the joinder of the cases was so prejudicial that reversal is required."

10

offense, or the joinder of the charges converts the matter into a capital case.' [Citation.] When, as here, crimes of the same class are charged together, 'evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together . . . .'"

Our record shows the trial court considered the factors identified in *People v. Cook*, in denying the motion to sever. The trial court explained its ruling as follows: "I don't have any problem with these cases, with these charges being tried together. I'm going to deny the defense motion to sever[]. I don't see the prejudice to the defendant. I don't see it as a denial of due process. You certainly can attack the count however you wish in terms of credibility and the evidence that comes forward, but in terms of whether or not there's such prejudice that warrants a severance of the count, I don't see it. It doesn't appear to me that one count has particularly strong evidence and being used to bolster another count with weaker evidence. That doesn't appear to be the case. [¶] This is not a case where one of the crimes has highly inflammatory charges and one doesn't, like a drug case and a child molest or child molest and a murder or something like that. These are both the same class of crimes which section 954 specifically allows for these types of charges to be tried together. They're both carjackings. They are—they contain similar witnesses that are going to testify with respect to both counts, both dates in September 25, '05 and October 3rd of '05. [¶] There is a good argument that some of the evidence would be cross-admissible concerning the incident and the fact that they're so close in time, eight days apart, they're eight blocks apart, both in the City of Anaheim. [¶] There would be a strong argument that the evidence would come in under [Evidence Code section ]1101[, subdivision ](b) concerning that they're both carjackings, both male Hispanics, both driving Toyotas that are carjacked in the city eight days apart. So there appears to be, at least in the court's eyes, an indication that some of the evidence might be cross-admissible. But that is not the only test. [¶] I don't see the highly inflammatory on one charge as the other as I already mentioned. So accordingly your motion is denied.

11

[¶] Now, that doesn't mean there aren't going to be evidentiary issues with the one count where you indicated that the People have failed to secure the victim in that case and we will have to address that and go through that . . . . But in terms of the severance, the court's going to deny the defense motion."

Garcia argues the trial court erred because evidence of each carjacking offense was not cross-admissible under Evidence Code section 1101, subdivision (b); counts 1 and 3 were likely to inflame the jury because Garcia used a gun in the commission of count 1; and the joinder of counts 1 and 3 with count 2 resulted in the joining of two weak cases together, thereby "risking a 'spillover' effect of the aggregate of the evidence in both cases" (boldface & underscoring omitted). We address each of Garcia's contentions in turn.

Although Evidence Code section 1101, subdivision (a) "generally prohibits the admission of evidence of a person's character or a trait of his or her character when offered to prove his or her conduct on a specified occasion" (*People v. Avila* (2006) 38 Cal.4th 491, 586), Evidence Code section 1101, subdivision (b) provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

Here, there were significant similarities in the circumstances and commission of the carjacking offenses. Both involved the carjacking of a Toyota vehicle, occupied by a man in the early morning hours within days of each other and within the same geographic area. In each carjacking, Garcia, riding a bicycle, approached his victim and used a deadly weapon (a handgun in count 1 and a knife in count 2) to overcome the driver's resistance and take the vehicle. Thus, it is likely there would be

12

cross-admissibility of the evidence of each count.  In light of these similarities, even if the carjacking offenses were separately tried, evidence of the other would likely be admitted under Evidence Code section 1101, subdivision (b).

We do not consider Garcia's use of a handgun in count 1 to be inflammatory relative to his use of a knife held up to Delgante's throat in count 2.  Both are deadly weapons.  The use of a handgun under these circumstances is not a fact that mandates severance.

We also reject Garcia's argument that the trial court was required to sever counts 1 and 3 from count 2 to avoid joining two weak cases to unfairly increase the chance of conviction.  The evidence supporting each of the charged offenses, here, was not weak, particularly in light of the DNA evidence, presented at trial, reasonably establishing Garcia's presence in both Ronsivalle's and Delgante's vehicles.  Furthermore, the record does not show that the trial court's denial of the motion to sever was "so grossly unfair as to deny [Garcia] due process."  (*People v. Cook*, *supra*, 39 Cal.4th at p. 581.)

III.

### THE TRIAL COURT'S ADMISSION OF EVIDENCE OF RONSIVALLE'S 911 CALL DID NOT VIOLATE GARCIA'S RIGHT TO CONFRONTATION UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

Citing *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), Garcia argues his Sixth Amendment right to confrontation was violated when the trial court denied his motion to exclude evidence of Ronsivalle's tape-recorded 911 call because Ronsivalle was not available for cross-examination at trial.  Garcia contends the trial court erred by concluding Ronsivalle's statements during the 911 call were admissible as spontaneous or excited utterances under Evidence Code sections 1240 and 1241, and did not constitute testimonial statements within the meaning of *Crawford*.

13

In *Crawford*, *supra*, 541 U.S. at page 40, the defendant was tried on charges of criminal assault and attempted murder. The trial court determined the defendant's wife's tape-recorded statement to the police, which undermined in part the defendant's version of the subject incident, was admissible as it bore "'particularized guarantees of trustworthiness.'" (*Ibid.*) The trial court thereafter allowed the tape-recorded statement to be played for the jury even though the defendant's wife was barred from testifying without the defendant's consent, pursuant to Washington state's marital privilege. (*Ibid.*) The United States Supreme Court held the admission of the tape-recorded statement violated the confrontation clause of the Sixth Amendment. (*Crawford*, *supra*, at p. 42.) The Supreme Court stated that "at a minimum," testimonial statements within the meaning of the confrontation clause include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial," and "police interrogations." (*Id.* at p. 68.) The court noted the defendant's wife's "recorded statement, knowingly given in response to structured police questioning, qualifie[d] under any conceivable definition [of interrogation]." (*Id.* at p. 53, fn. 4.)

The United States Supreme Court "shed some further light on the question of what constitutes a 'testimonial' out-of-court statement" in *Davis v. Washington* (2006) 547 U.S. 813 (*Davis/Hammon*), in which the Supreme Court decided two consolidated cases, *Davis v. Washington* and *Hammon v. Indiana*. (*People v. Geier* (2007) 41 Cal.4th 555, 602-603.) In *Davis*, the court concluded a victim's statements to a 911 operator, describing the defendant's ongoing attack did not constitute testimony within the meaning of the confrontation clause. (*Davis/Hammon*, *supra*, at pp. 824-825.) The court concluded the questions and answers exchanged during that call were intended primarily to deal with an ongoing emergency, not to establish past facts for a criminal prosecution. (*Ibid.*) The court held that the confrontation clause is concerned solely with hearsay statements that are testimonial. (*Id.* at pp. 825-826.) In *Hammon*, the court concluded that a victim's responses to police questioning, after the police responded to a domestic

14

violence complaint, were testimonial in that they "were not much different from the statements we found to be testimonial in *Crawford*. It is entirely clear from the circumstances that the interrogation [of the victim] was part of an investigation into possibly criminal past conduct—as, indeed, the testifying officer expressly acknowledged." (*Davis/Hammon*, *supra*, at p. 829; see *People v. Cage* (2007) 40 Cal.4th 965, 983.)

In *People v. Blacksher* (2011) 52 Cal.4th 769, 811 (*Blacksher*), the California Supreme Court stated, "[t]he *Crawford* court did not give a comprehensive definition of the term 'testimonial' and subsequent cases have addressed how the rule should be applied. The [United States Supreme C]ourt has recently considered that question in *Michigan v. Bryant* (2011) 562 U.S. __ [ . . . 131 S.Ct. 1143] (*Bryant*)." The California Supreme Court in *Blacksher* interpreted *Michigan v. Bryant* (2011) 562 U.S. __ [131 S.Ct. 1143] (*Bryant*) to hold that "[i]t is the 'primary purpose of creating an out-of-court substitute for trial testimony' that implicates the confrontation clause" (*Blacksher*, *supra*, at p. 813) and that the following factors should be considered in determining the primary purpose with which a statement is given by the declarant or obtained by law enforcement:

"(1) The court must objectively evaluate the circumstances of the encounter along with the statements and actions of the parties. In this latter regard, 'the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions' in the given situation. [Citation.] [¶] . . . [¶]

"(2) The court should consider whether an '"ongoing emergency"' exists, or appears to exist, when the statement was made. Such an ongoing emergency focuses the participants on something other than obtaining evidence for trial. [Citation.] Again, the analysis is objective. Even if hindsight reveals that an emergency did not, in fact,

15

exist, if it reasonably appeared to exist based on the information known when the statement was made the emergency test is satisfied. [Citation.] [¶] . . . [¶]

"(3) Whether an ongoing emergency exists is a 'highly context-dependent inquiry.' [Citation.] Even when a threat to an initial victim is over, a threat to first responders and the public may still exist. The type of weapon involved may expand or limit the duration and scope of the emergency. A situation created by the use of fists may involve less ongoing danger than the use of a firearm. [Citation.]

"(4) The medical condition of the declarant is a relevant consideration, as it bears on both the injured declarant's purpose in speaking and the potential scope of the emergency. [Citation.] As the high court describes it, the declarant's medical condition 'sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one.' [Citation.]

"(5) A nontestimonial encounter addressing an emergency may evolve, converting subsequent statements into testimonial ones. A real or apparent emergency may resolve itself. The disarming or capture of a perpetrator may end the danger. It may become clear from the declarant's and officer's statements or behavior that the focus has shifted from meeting the emergency to obtaining evidence for trial. [Citation.]

"(6) Finally, regardless of the existence of an emergency, the informality of the statement and the circumstances of its acquisition are important considerations. Inquiries that are conducted in a disorganized way and in turbulent circumstances are distinguishable from a jailhouse interview, as in *Crawford*, or the sequestered and formal preparation of an affidavit, as in *Hammon v. State*. [Citation.]" (*Blacksher, supra*, 52 Cal.4th at pp. 813-815.)

In *Bryant, supra*, 562 U.S. at page __ [131 S.Ct. at page 1150], police officers responded to a call that a man had been shot. At the scene, the responding officers found a man mortally wounded on the ground. (*Ibid.*) The officers asked the

16

victim what had happened, who had shot him, and where it had happened. (*Ibid.*) The victim told the officers that the defendant had shot him outside the defendant's residence and also provided details of the shooting. (*Ibid.*) The conversation lasted about 10 minutes. (*Ibid.*) The United States Supreme Court applied the above quoted factors, and concluded the victim's statements to the police were not testimonial statements. (*Id.* at p. __ [131 S.Ct. at p. 1167].)

As summarized by the *Blacksher* court, the *Bryant* court reached its conclusion based on the following analysis: The "continuing emergency went beyond any private dispute between [the defendant] and the victim. Neither the victim nor the police knew the current location of the armed shooter. [Citation.] In addition, because the victim did not disclose the motive of the shooting, '[t]he police did not know, and [the victim] did not tell them, whether the threat was limited to him.' [Citation.] There was no indication that the emergency had ended because the victim gave the police 'no reason to think that the shooter would not shoot again if he arrived on the scene.' [Citation.] The court also noted that the victim was bleeding, 'had difficulty breathing and talking,' and was in considerable pain. These facts did not suggest that he made his statements with the '"primary purpose" "to establish or prove past events potentially relevant to later criminal prosecution."' [Citation.] As for the informality of the encounter, unlike a formal station house interrogation, 'the questioning in this case occurred in an exposed, public area, prior to the arrival of emergency medical services, and in a disorganized fashion' and the circumstances revealed that 'the situation was fluid and somewhat confused,' as different officers arrived with each asking '"what had happened."' [Citation.] Finally, the court considered the statements and actions of the parties. The officers, by asking the victim what had happened, who had shot him, and where the shooting took place, posed 'the exact type of questions necessary to allow the police to "'assess the situation, the threat to their own safety, and possible danger to the potential victim'" and to the public [citation], including to allow them to ascertain "whether they

17

would be encountering a violent felon," [citation].'" (*Blacksher*, *supra*, 52 Cal.4th at pp. 815-816.)

Applying the factors set forth in *Bryant* and *Blacksher*, we conclude Ronsivalle's statements to dispatcher Roberts during his 911 call did not constitute testimonial hearsay. Ronsivalle's 911 call was placed minutes after he had been carjacked by a man who had pointed a handgun at him. Ronsivalle made the call from a public phone at a gas station. Ronsivalle told Roberts he did not know in which direction the carjacker went. Even if Ronsivalle was no longer in danger, he communicated an armed man was at large in the general vicinity, who still posed a threat to first responders as well as the public. Ronsivalle's statements were therefore made in the context of an ongoing emergency.

Our review of the transcript of the 911 call showed that Ronsivalle still under stress from the carjacking. He told Roberts he had an emergency, he was unsure whether he required medical attention, and that his blood pressure was low. Roberts's questions during the 911 call asked for Ronsivalle's location, what had happened, and for the carjacker's description, and, thus, Roberts "posed 'the exact type of questions necessary to allow the police to "'assess the situation'"'" and any ongoing threat to the safety of Ronsivalle, responding police officers, and the public in general. (*Blacksher*, *supra*, 52 Cal.4th at p. 816.) The 911 call ended when the police officers arrived at Ronsivalle's location.

We conclude that Ronsivalle's statements made during the 911 call were not testimonial and the trial court's admission of the 911 call, therefore, did not violate the confrontation clause of the Sixth Amendment.

18

## IV.

### THE TRIAL COURT DID NOT ERR BY REFUSING TO STRIKE GARCIA'S PRIOR CONVICTIONS BEFORE IMPOSING SENTENCE.

Garcia contends the trial court erred by refusing to strike his prior convictions pursuant to section 1385 and *Romero*, *supra*, 13 Cal.4th 497. We review the trial court's refusal to strike Garcia's prior convictions for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 376.)

In determining whether to strike a prior conviction, the California Supreme Court has stated, "'the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.'" (*People v. Carmony*, *supra*, 33 Cal.4th at p. 377.)

In reviewing whether the trial court abused its discretion, "we are guided by two fundamental precepts. First, '"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."' [Citation.] Second, a '"decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"' [Citation.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its discretion is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony*, *supra*, 33 Cal.4th at pp. 376-377.)

19

Here, in determining whether to strike the prior convictions, the trial court expressly acknowledged its discretion to strike Garcia's prior convictions. The court explained its decision as follows:

"And when I look at all the circumstances . . . of this case, your criminal history, your characteristics, your background, your prospects, there is no way that you deserve any type of *Romero* consideration, in my eyes, based on the life that you have chosen to lead for the past 20 or so years.

"Your criminal history is replete with numerous convictions that are serious, that are violent. Yes, the burglaries are old and you were 18 at the time. But you did a 66-month prison term because of that. And just three months after being released to parole at the age of 21, you went back to a life of crime, stealing a car, and you were sentenced to two years in prison.

"At age 29 you were convicted of assault with a deadly weapon for stabbing a victim in the head and neck; got a year in jail. And then the year after that, you are convicted of being a gang member carrying a loaded firearm and committing that crime in association with and for the benefit of a criminal street gang. So it's clear you have no regard[] for the law and society, regardless of your upbringing.

"Mr. Tony Garcia [(Garcia's brother)] is here and made an impassioned statement to the court. He was subject to a lot of the same upbringing that you had. And the court acknowledges that no child should have to go through circumstances like that.

"But you were given chances early. And every single time after you finished serving your time, you came out on parole or probation and started committing additional crimes. So obviously, to me, how can I justify striking your strikes with that kind of criminal behavior?

"Not only that, I haven't even mentioned the facts and circumstances of this case, which I read your brief, [defendant's counsel], and obviously there—there's a reason the punishment is severe for these types of crimes.

20

"But the fact that these are two separate carjackings involving violence, both involving weapons, one a gun and one a knife, individual victims who were scared and terrorized, one to the point of not even wanting to come to court. Another comes to testify and is beaten up. And there's evidence to support the fact that Mr. Garcia was involved in that, either directly or indirectly.

"To me, this is exactly the type of defendant that the Three Strikes law was enacted for. And I would be doing society a disservice if I brought him outside of this Three Strikes scheme based on this horrendous criminal record.

" . . . [I]t should also be noted the fact you were a parolee at large when you committed these violent and vicious crimes.

"So on my analysis of everything, this is not the case where I feel that exercising judicial discretion is warranted and, accordingly, your request to strike . . . Mr. Garcia's strikes per *People vs. Romero* is denied." (First italics added.)

Garcia does not argue that the trial court was unaware of its discretion to strike the prior convictions or that the court relied on any improper criterion in denying the motion to strike his prior convictions. Garcia does not challenge the accuracy of the trial court's summary of his criminal history, background, character, and prospects. The record shows the trial court considered all the relevant facts and did not abuse its discretion in denying Garcia's motion to strike his prior convictions.

Without providing relevant legal analysis to support his argument, Garcia asserts, in his appellate briefs, that the denial of his motion to strike the prior convictions resulted in the imposition of a cruel and unusual punishment in violation of the United States and California Constitutions. Garcia forfeited this argument by failing to raise it in the trial court in the first instance. (*People v. Em* (2009) 171 Cal.App.4th 964, 971, fn. 5.) We nevertheless "'reach the merits under the relevant constitutional standards, in the interest of judicial economy to prevent the inevitable ineffectiveness-of-counsel claim.'" (*Ibid*.)

21

Article I, section 17 of the California Constitution prohibits infliction of "[c]ruel or unusual punishment." A sentence may violate this prohibition if "'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" (*People v. Dillon* (1983) 34 Cal.3d 441, 478.) The Eighth Amendment to the United States Constitution states, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (U.S. Const., 8th Amend.) "The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" (*Ewing v. California* (2003) 538 U.S. 11, 20.) The appropriate standard for determining whether a particular sentence for a term of years violates the Eighth Amendment is gross disproportionality. (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 (conc. opn. by Kennedy, J.).)

Garcia argues the sentence that the trial court imposed is disproportionate to his individual culpability and thus constitutes cruel and unusual punishment. "In assessing such a claim, we must examine the circumstances of the crime, as well as the defendant's personal characteristics. [Citation.] If, given these factors, 'the penalty imposed is "grossly disproportionate to the defendant's individual culpability" [citation], so that the punishment "'"shocks the conscience and offends fundamental notions of human dignity"'"' [citation], [we] must invalidate the sentence as unconstitutional.'" (*People v. Boyer* (2006) 38 Cal.4th 412, 488.)

This is not a close case. As summarized by the trial court, quoted *ante*, Garcia had a long criminal history before committing the serious and dangerous offenses of carjacking with the personal use of a deadly weapon. (See *In re Coley* (2012) 55 Cal.4th 524, 560-561 ["[W]hen, as in the present case, a trial court explicitly explains its reasons for declining to strike prior convictions for sentencing purposes, it is appropriate to rely upon the trial court's reasons and findings in evaluating [the defendant]'s Eighth Amendment claim"].) Nothing in our record supports a finding that the sentence the trial

22

court imposed is disproportionate to Garcia's individual culpability.  (See *People v. Wingo* (1975) 14 Cal.3d 169, 174 [a defendant must overcome a "considerable burden" to show the sentence is disproportionate to his or her level of culpability]; *Lockyer v. Andrade* (2003) 538 U.S. 63, 73 [successful grossly disproportionate challenges are "'exceedingly rare'" and appear only in an "'extreme'" case].)

We find no error.


DISPOSITION

The judgment is affirmed.



FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


IKOLA, J.

23